NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Strafford
No. 2015-0366

NEW HAMPSHIRE RIGHT TO LIFE & a.

v.

DIRECTOR, NEW HAMPSHIRE CHARITABLE TRUSTS UNIT & a.

Argued: January 13, 2016
Opinion Issued: June 2, 2016

Wadleigh, Starr & Peters, PLLC, of Manchester (Michael J. Tierney on the brief and orally), for the plaintiffs.

Joseph A. Foster, attorney general (Megan A. Yaple, attorney, and Lynmarie Cusack, assistant attorney general, on the brief, and Ms. Yaple orally), for the defendants.

BASSETT, J. The plaintiffs, New Hampshire Right to Life and Jackie Pelletier, appeal orders by the Superior Court (Mangones, J.) granting in part and denying in part their petition for an order requiring the defendants, the Director, Charitable Trusts Unit (CTU), the Office of the New Hampshire Attorney General (AG), the New Hampshire Board of Pharmacy (Board of Pharmacy), and the New Hampshire Department of Health and Human Services (DHHS), collectively referred to as "the State," to produce, under the

Right-to-Know Law, without redaction, all documents and other materials responsive to the plaintiffs' prior requests.  See RSA ch. 91-A (2013 & Supp. 2015).  The trial court ordered the State to produce certain documents, but upheld the State's withholding or redactions of other documents because it determined that they were exempt from disclosure under the Right-to-Know Law.  See RSA 91-A:5, IV (2013).  On appeal, the plaintiffs argue that in so deciding and in denying their associated requests for attorney's fees and costs, the trial court erred.  We affirm in part, reverse in part, vacate in part, and remand.

I.  Background

The relevant facts follow.  New Hampshire Right to Life "is a New Hampshire non-profit organization opposed to government support, by taxpayer subsidies, of medical clinics that provide abortion services."  Appeal of N.H. Right to Life, 166 N.H. 308, 310 (2014).  At issue are three Right-to-Know requests that the plaintiffs made of the State in July 2014 and September 2014 for documents and materials related to Planned Parenthood of Northern New England (PPNNE) and/or its New Hampshire clinics.  At oral argument, the parties agreed that any issues regarding a fourth Right-to-Know request are now moot.  According to a declaration (a sworn statement filed as a pleading with a court), and not apparently disputed by the plaintiffs, PPNNE is a private, non-profit organization affiliated with Planned Parenthood Federation of America (Planned Parenthood).  See Right to Life v. Dept. of Health & Human Serv's, 778 F.3d 43, 49 (1st Cir.), cert. denied, 136 S. Ct. 383 (2015); see also Ramelb, Note, Public Health Care Funding:  The Battle Over Planned Parenthood, 47 Val. U. L. Rev. 499, 510 (2013).  Planned Parenthood provides "medical services related to family planning, men and women's sexual health, and abortions."  Ramelb, supra at 510.  PPNNE operates reproductive health care clinics in six New Hampshire municipalities — Claremont, Derry, Exeter, Keene, Manchester, and West Lebanon.  Right-to-Life, 778 F.3d at 46.

The first request, sent on July 14, 2014, sought "copies of all of [PPNNE's] 2014-2015 [Limited Retail Drug Distributorship] licenses for its six New Hampshire clinics" and "any documents related to these clinics either sent or received by the Board [of Pharmacy]."  (Bolding omitted.)  See RSA 318:42, VII, :51-b (2015).  PPNNE has operated in New Hampshire for a number of years as a licensed limited retail drug distributor pursuant to a contract with DHHS.  Appeal of N.H. Right to Life, 166 N.H. at 310; see RSA 318:42, VII, :51-b.  As a limited retail drug distributor, PPNNE must reapply annually to the Board of Pharmacy to renew its licenses, the terms of which run from July 1 to June 30 of each year.  Appeal of N.H. Right to Life, 166 N.H. at 310.

The State responded to this request on July 31, 2014, by producing certain documents and withholding others as "exempt from disclosure under RSA 91-A:5 and RSA 318:30, I."  See RSA 91-A:5 (Supp. 2015) (setting forth

2

categories of information that are exempt from disclosure under the Right-to-Know Law); see also RSA 318:30, I (2015) (exempting from disclosure, under the Right-to-Know Law, Board of Pharmacy investigations and information discovered pursuant to such investigations "unless such information becomes the subject of a public disciplinary hearing"). The State's decision to exempt certain documents from disclosure pursuant to RSA 318:30, I, is not at issue in this appeal.

The second request, sent on July 28, 2014, sought "all documents, no matter what form, including but not limited to, printed documents, electronic documents, e-mails, or any other form of documents," that constitute: (1) communications "by, from or regarding" certain reproductive health centers and individuals representing such centers; (2) "[a]ny and all documents in the possession of the [AG] regarding any reproductive health facility"; (3) certain specific materials, including "DVDs containing security camera footage from July 10, 2014 and July 17, 2014 outside the Manchester clinic"; and (4) "[a]ny and all documents in the possession of the [AG] regarding abortion clinic buffer zones, reproductive health center patient safety zones, RSA 132:37 to 39 in New Hampshire or in any other State." The State responded to the plaintiffs' second request on September 4, 2014, producing some documents and informing the plaintiffs that other documents had been redacted or withheld because they contained information exempt from disclosure under RSA 91-A:5, IV.

The third request, made on September 11, 2014, sought specified financial information about certain reproductive health clinics. The State produced some information, but, with regard to the 2010 financial statements of the Joan G. Lovering Health Center (Feminist Health Center), it redacted certain monetary amounts.

The plaintiffs filed the within complaint for injunctive relief, attorney's fees, and costs on October 20, 2014. Subsequently, the State provided to the trial court for in camera review approximately 1,500 pages of documents and three DVDs. The documents and materials provided to the trial court comprised those that had been produced to the plaintiffs and those that had been withheld from disclosure. The State also provided to the court and to the plaintiffs a "Table of Contents," listing the previously-produced documents with corresponding "bates-stamp" numbers[1] and the withheld documents with corresponding bates-stamp numbers. Following its in camera review of the information withheld or redacted, and after holding a hearing, the trial court ordered the State to produce certain documents and information, but upheld most of the State's decisions to redact or withhold. This appeal followed. The

---

[1] A bates-stamp number is "[t]he identifying number or mark affixed to a document or to the individual pages of a document in sequence, usu[ally] by numerals but sometimes by a combination of letters or numerals." Black's Law Dictionary 181 (10th ed. 2014).

parties have not provided a transcript of the trial court hearing as part of the appellate record. The record does not indicate whether the hearing was an evidentiary hearing.

After this appeal was filed, we ordered the plaintiffs to identify, by bates-stamp number, information that had been submitted to the trial court for in camera review, but which they assert should have been, and was not, disclosed. In a January 12, 2016 letter, the plaintiffs identified the following as the documents and materials "at issue, addressed and argued in the Briefs": (1) three DVDs containing security footage of the area outside of the Manchester office of PPNNE; and (2) documents bates-stamped W305-06 (declaration of Meagan Gallagher), W1475-76 (e-mail communications between AG and clinic officials), W36-294 (e-mail communications between AG and such offices in other states), W33-35 (correspondence regarding the DVDs), P31-56 (license renewal applications filed with the Board of Pharmacy), and P105-20 (documents related to the Feminist Health Center).

Thereafter, we ordered the superior court to transfer to this court the un-redacted versions of the documents and materials so identified. Our analysis in this case is limited to the DVDs and documents that the plaintiffs identified by bates-stamp number in their January 12, 2016 letter. Although, in their January letter, the plaintiffs also objected to the State's claim of work product and attorney-client privilege for unknown withheld documents, they have not briefed that issue, and, accordingly, we deem it to be waived on appeal. See Aubert v. Aubert, 129 N.H. 422, 428 (1987) ("Arguments not briefed are waived on appeal.").

## II. Analysis

### A. General Law and Standard of Review

Resolution of this case requires that we interpret the Right-to-Know Law. "The ordinary rules of statutory construction apply to our review of the Right-to-Know Law." CaremarkPCS Health v. N.H. Dep't of Admin. Servs., 167 N.H. 583, 587 (2015) (quotation omitted). "Thus, we are the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole." Id. (quotation omitted). "When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used." Id. (quotation omitted). "We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." Id. (quotation omitted). "We also interpret a statute in the context of the overall statutory scheme and not in isolation." Id. (quotation omitted).

The purpose of the Right-to-Know Law "is to ensure both the greatest possible public access to the actions, discussions and records of all public

4

bodies, and their accountability to the people." RSA 91-A:1 (2013); see CaremarkPCS Health, 167 N.H. at 587. Thus, the Right-to-Know Law furthers "our state constitutional requirement that the public's right of access to governmental proceedings and records shall not be unreasonably restricted." Montenegro v. City of Dover, 162 N.H. 641, 645 (2011); see N.H. CONST. pt. I, art. 8. "Although the statute does not provide for unrestricted access to public records, we resolve questions regarding the Right-to-Know Law with a view to providing the utmost information in order to best effectuate these statutory and constitutional objectives." CaremarkPCS Health, 167 N.H. at 587 (quotation omitted). "As a result, we broadly construe provisions favoring disclosure and interpret the exemptions restrictively." Id. (quotation omitted). We also look to the decisions of other jurisdictions interpreting similar acts for guidance, including federal interpretations of the federal Freedom of Information Act (FOIA). 38 Endicott St. N. v. State Fire Marshal, 163 N.H. 656, 660 (2012). Such similar laws, because they are in pari materia, are "interpretatively helpful, especially in understanding the necessary accommodation of the competing interests involved." Montenegro, 162 N.H. at 645 (quotation omitted).

"When a public entity seeks to avoid disclosure of material under the Right-to-Know Law, that entity bears a heavy burden to shift the balance toward nondisclosure." Id. at 649. We review the trial court's statutory interpretation and its application of law to undisputed facts de novo. 38 Endicott St. N., 163 N.H. at 660.

At issue in this case is RSA 91-A:5, which identifies materials that are exempt from disclosure under the Right-to-Know Law, including "confidential, commercial, or financial information . . . and other files whose disclosure would constitute invasion of privacy." RSA 91-A:5, IV. The plaintiffs contend that the trial court misapplied RSA 91-A:5, IV when it upheld the State's withholding of information that the State contended: (1) comprised attorney work product; or (2) if disclosed, would constitute an invasion of privacy.

### B. Information Withheld as Attorney Work Product

The information that the State withheld on work product grounds is related to a pending federal civil rights action brought pursuant to 42 U.S.C. § 1983 (2012) challenging the constitutionality, facially and as applied, of RSA 132:38 (2015). See Verified Complaint at 13-22, Mary Rose Reddy & a. v. Joseph Foster & a., No. 1:14-cv-00299-JL (D.N.H. July 7, 2014), ECF No. 1.[2]

---

[2] On April 1, 2016, the Federal District Court for the District of New Hampshire dismissed the plaintiffs' complaint on the ground that they lacked standing to bring it. See Corrected Opinion and Order at 35-36, Mary Rose Reddy & a. v. Joseph Foster & a., No. 1:14-cv-00299-JL (D.N.H. Apr. 1, 2016), ECF No. 83. The plaintiffs have appealed that decision to the First Circuit Court of Appeals. See Notice of Appeal, Mary Rose Reddy & a. v. Joseph Foster & a., No. 16-1432 (1st Cir. Apr. 21, 2016), ECF No. 86.

5

RSA 132:38, I, provides that, during the business hours of a reproductive health care facility, "[n]o person shall knowingly enter or remain on a public way or sidewalk adjacent to" such a facility "within a radius up to 25 feet of any portion of an entrance, exit, or driveway of" that facility. See RSA 132:38, IV. For ease of reference, we refer to the federal litigation as the "buffer zone litigation."

The documents and materials at issue were created in anticipation of a preliminary injunction hearing in that litigation. However, the hearing never took place because the litigation was stayed before it could be held. Pelletier, a plaintiff in this case, is also a plaintiff in the buffer zone litigation. See Verified Complaint, supra at 1.

The plaintiffs specifically challenge the trial court's determination that the following are exempt from disclosure because they constitute attorney work product: (1) a signed, undated draft declaration of Meagan Gallagher, President and Chief Executive Officer of PPNNE, (the Gallagher declaration) (W305-06); (2) July 2014 e-mail messages between the AG and Jennifer Frizzell, Vice-President for Public Policy of PPNNE, and between the AG and Dalia Vidunas, the Executive Director of the Concord Feminist Health Center (W1475-76); and (3) e-mail messages between the AG and counterparts in other States (W36-294).

### 1. Summary of Work Product Law

The parties do not dispute, and we agree with the trial court, that attorney work product, like communications protected by the attorney-client privilege, falls within the Right-to-Know Law exemption for "confidential" information. RSA 91-A:5, IV; see Prof. Fire Fighters of N.H. v. N.H. Local Gov't Ctr., 163 N.H. 613, 614-15 (2012) (explaining that "[c]ommunications protected under the attorney-client privilege fall within the exemption for confidential information"); see also FTC v. Grolier Inc., 462 U.S. 19, 23 (1983) (interpreting FOIA to exempt from disclosure information subject to the attorney work product doctrine).

The trial court applied New Hampshire common law to determine whether the challenged documents were subject to the work product doctrine. In so doing, the trial court erred. The buffer zone litigation was pending in the Federal District Court for the District of New Hampshire under that court's federal question jurisdiction. See Verified Complaint, supra at 3. Accordingly, federal common law governs whether the documents challenged by the plaintiffs are subject to the work product doctrine. See Gargiulo v. Baystate Health, Inc., 826 F. Supp. 2d 323, 325 (D. Mass. 2011) (observing that "[w]ith federal question jurisdiction, courts usually apply federal [privilege] law to the federal claims and pendent state law claims"); Smith v. Alice Peck Day Memorial Hosp., 148 F.R.D. 51, 53 (D.N.H. 1993) (same); Fed. R. Ev. 501.

6

Thus, as a matter of comity with the federal court, and to ensure that the Right-to-Know Law is not used as a means of circumventing the civil discovery rules that govern the buffer zone litigation, we apply federal common law. Although the trial court did not apply federal common law in its analysis, we do so in the first instance because we review de novo the trial court's application of law to undisputed facts. 38 Endicott St. N., 163 N.H. at 660.

The work product doctrine safeguards the work of an attorney done "in anticipation of, or during, litigation from disclosure to the opposing party." State of Maine v. U.S. Dept. of Interior, 298 F.3d 60, 66 (1st Cir. 2002); see Hickman v. Taylor, 329 U.S. 495, 508-13 (1947) (declaring that witness interviews conducted by opposing counsel in preparation for litigation are protected by a qualified privilege); see also Fed. R. Civ. P. 26(b)(3). The doctrine encompasses work done by non-lawyers at the direction of lawyers. United States v. Nobles, 422 U.S. 225, 238-39 (1975).

Outside the FOIA context, federal courts "distinguish between 'opinion' work product and 'ordinary' work product," and they "typically afford ordinary work product only a qualified immunity, subject to a showing of substantial need and undue hardship, while requiring a hardier showing to justify the production of opinion work product." In re San Juan Dupont Plaza Hotel Fire Litigation, 859 F.2d 1007, 1014, 1015 (1st Cir. 1988); see Hickman, 329 U.S. at 511-13. Opinion work product "encompass[es] materials that contain the mental impressions, conclusions, opinions or legal theories of an attorney," and ordinary work product "embrac[es] the residue." In re San Juan Dupont Plaza Hotel Fire Litigation, 859 F.2d at 1014; see Hickman, 329 U.S. at 511-13.

However, for FOIA purposes, the distinction between "opinion" and "ordinary" work product is immaterial. See FTC, 462 U.S. at 26-27; 38 Endicott St. N., 163 N.H. at 660 (explaining that we look to federal interpretations of the federal FOIA when construing the Right-to-Know Law). This is so because the test for disclosure under FOIA "is whether the documents would be routinely or normally disclosed upon a showing of relevance." FTC, 462 U.S. at 26 (quotations omitted). Necessarily, information that is protected from discovery under a qualified privilege is not "routinely or normally disclosed upon a showing of relevance." Id. (quotations omitted). As the Supreme Court has explained, for FOIA purposes, "[i]t makes little difference whether a privilege is absolute or qualified in determining how it translates into a discrete category of documents that Congress intended to exempt from disclosure under [FOIA]. Whether its immunity from discovery is absolute or qualified, a protected document cannot be said to be subject to routine disclosure." Id. at 27 (quotation omitted); see A. Michael's Piano, Inc. v. F.T.C., 18 F.3d 138, 146 (2d Cir. 1994). "This approach prevents . . . FOIA from being used to circumvent civil discovery rules." U.S. Dep't of Justice, Guide to the Freedom of Information Act, Exemption 5, at 3 (2013 ed.), available at https://www.justice.gov/sites/default/files/oip/legacy/2014/07/

7

23/exemption5.pdf; see United States v. Weber Aircraft Corp., 465 U.S. 792, 801 (1984) (explaining that a party cannot "obtain through . . . FOIA material that is normally privileged" because this "would create an anomaly in that . . . FOIA could be used to supplement civil discovery," which is a construction of FOIA that the Court has "consistently rejected").

We adopt this paradigm in the context of the Right-to-Know Law based upon similar concerns that the Right-to-Know Law could be used to circumvent civil discovery rules. Indeed, at oral argument, the plaintiffs agreed that the Right-to-Know Law should not be used to circumvent civil discovery rules. Thus, we hold that the test for disclosure under the Right-to-Know Law "is whether the documents would be routinely or normally disclosed upon a showing of relevance." FTC, 462 U.S. at 26 (quotations omitted). Accordingly, because documents protected by work product are not "routinely or normally disclosed upon a showing of relevance," they are exempt from disclosure under the Right-to-Know Law. Id. (quotations omitted).

### 2. Gallagher Declaration

The Gallagher declaration contains factual assertions about PPNNE, interpretations of RSA 132:38 (the buffer zone statute), statements about Gallagher's authority within PPNNE, and statements about PPNNE's intentions with regard to creating buffer zones as authorized by statute. The record on appeal establishes that the declaration was prepared at the direction of attorneys at the Attorney General's Office for use in the buffer zone litigation.

Applying state law, the trial court found that the Gallagher declaration is subject to the work product doctrine because, although it "includes some purely factual information," it "also contains [Gallagher's] policy statements and opinions." See State v. Chagnon, 139 N.H. 671, 676 (1995) (explaining, in the context of a criminal case, that "[w]itness statements that contain purely factual information should not be considered work product," but "[i]f a report also includes notes of the investigator or attorney recording his or her analysis, mental process, impressions of what the witness said, or reflecting trial strategy, such notes would fall within the work product doctrine and could be redacted"). The trial court determined that, although the opinions were not those of the attorney who prepared the declaration, the inclusion of such statements "in a draft pleading may provide insight into the [AG's] litigation strategy in the ongoing federal litigation." The trial court further determined that the declaration was "not merely a witness statement or notes from a witness interview," but, instead, was "essentially a draft pleading for submission into evidence at a hearing in . . . pending litigation." The court noted that the plaintiffs in the buffer zone litigation "would likely not have been able to discover this [declaration] prior to its introduction into evidence in that litigation."

8

We conclude that the Gallagher declaration is subject to the work product doctrine under federal law, and, therefore, agree with the trial court that it is exempt from disclosure under the Right-to-Know Law.  See Doyle v. Comm'r, N.H. Dep't of Resources & Economic Dev., 163 N.H. 215, 222 (2012) (acknowledging that when "the trial court reaches the correct result on mistaken grounds, we will affirm if valid alternative grounds support the decision" (quotation omitted)).  The declaration was prepared at the direction of attorneys at the Attorney General's Office for use in the buffer zone litigation and, as such, constitutes attorney work product.  See In re San Juan Dupont Plaza Hotel Fire Litigation, 859 F.2d at 1016 (explaining that draft pleadings constitute only ordinary attorney work product because they are "drawn with the realization that they will be served upon the other parties to the case"); see also Nobles, 422 U.S. at 238-39 (determining that the work product doctrine protects documents drafted by non-attorneys at an attorney's direction).  Accordingly, although we apply federal law and the trial court applied state law, we reach the same conclusion as the trial court reached — the Gallagher declaration is subject to the work product doctrine.  We, therefore, agree with the trial court that the Gallagher declaration was properly withheld from disclosure under the Right-to-Know Law.  See FTC, 462 U.S. at 26-27; see also Doyle, 163 N.H. at 222.

Contrary to the plaintiffs' assertions, the entire Gallagher declaration is exempt from disclosure under the Right-to-Know Law, even though it arguably contains some "purely factual information."  Federal courts have held that the work product doctrine encompasses purely factual information.  See Norwood v. F.A.A., 993 F.2d 570, 576 (6th Cir. 1993) (acknowledging that the work product doctrine protects factual material); see also Church of Scientology Intern. v. U.S. Dept. of Justice, 30 F.3d 224, 237 n.20 (1st Cir. 1994) (noting that "factual material contained within a document subject to the work product privilege often will be embraced within the privilege").

Moreover, even if the Gallagher declaration constitutes only "ordinary" work product, and, therefore, would be discoverable under federal rules of civil procedure upon a showing of substantial need, the Right-to-Know Law does not mandate disclosure.  See A. Michael's Piano, Inc., 18 F.3d at 146 (explaining that "[a]lthough factual materials falling within the scope of attorney work product" may be discovered in non-FOIA cases upon a showing of substantial need, under FOIA, "the test is whether information would routinely be disclosed in private litigation" (quotations omitted)); Martin v. Office of Special Counsel, MSPB, 819 F.2d 1181, 1187 (D.C. Cir. 1987) (ruling that FOIA exemption for attorney work product protects documents regardless of whether they contain purely factual information and concluding that FOIA did not mandate disclosure of signed witness statements or of attorney's interview notes because such documents constituted attorney work product); Manna v. U.S. Dept. of Justice, 815 F. Supp. 798, 814 (D.N.J. 1993) (observing that "factual work-product materials are immune from disclosure" under FOIA),

9

aff'd, 51 F.3d 1158 (3d Cir. 1995); United Technologies Corp. v. N.L.R.B., 632 F. Supp. 776, 781 (D. Conn. 1985) (ruling that, if a document is attorney work product, then the entire document is privileged from disclosure under FOIA, even though it contains non-privileged factual material).[3]

The plaintiffs further assert that any privilege was waived when PPNNE "shared" the Gallagher declaration with the AG, which did not represent PPNNE in the federal litigation. As previously discussed, however, PPNNE prepared the declaration at the direction of the AG. Moreover, although PPNNE was not a party in the buffer zone litigation, the attorney general was one of the defendants. In this context, there was no "waiver" of the work product doctrine. See Nobles, 422 U.S. at 238-39 (explaining that the work product doctrine extends to work performed by non-attorneys at the direction of attorneys).

### 3. E-mail messages to and from Frizzell and Vidunas

The July 2014 e-mail messages between the AG and Frizzell concerned the preparation of the Gallagher declaration. The e-mail messages between the AG and Vidunas concerned the preparation, for the buffer zone litigation, of an affidavit of another individual. The trial court found that the e-mail messages were properly withheld because they were subject to the attorney-client privilege and/or because they constituted attorney work product.

The plaintiffs conclude, without any analysis, that the messages do not constitute attorney work product. The plaintiffs contend that, even if they do constitute attorney work product, "any privilege [was] waived" because they were communications between the AG and individuals who are not parties to the buffer zone litigation. We disagree. The e-mail messages were created for the buffer zone litigation either by attorneys at the Attorney General's Office or at their direction. The subject of the e-mail messages was the preparation of pleadings for that litigation. The e-mail messages, thus, constituted attorney work product, and, in this context, no "waiver" occurred. See Nobles, 422 U.S. at 238-39. Given our conclusion, we need not address whether the e-mail messages were also subject to the attorney-client privilege.

---

[3] Although the First Circuit has not ruled directly upon this issue, it has cited A. Michael's Piano, Inc., 18 F.3d at 146, and Martin, 819 F.2d at 1186, with approval. See Church of Scientology Intern., 30 F.3d at 237 n.20 (explaining that "factual material contained within a document subject to the work product privilege often will be embraced within the privilege, and thus be exempt from disclosure").

### 4. E-mail messages to and from AG and Offices of Attorneys General in Other States

The e-mail messages at issue, which were exchanged between the AG and offices of attorneys general in other States, were created in connection with a case then pending before the United States Supreme Court: McCullen v. Coakley, 134 S. Ct. 2518 (2014). The e-mail messages include draft amicus briefs prepared for McCullen and concern the process by which the AG decided whether to join or file amicus briefs in that case.

The trial court found that these e-mail messages were properly withheld as "confidential" information because they constituted attorney work product and/or privileged attorney-client communications. RSA 91-A:5, IV. Because these e-mail messages contain the "mental impressions, conclusions, opinions or legal theories of an attorney," In re San Juan Dupont Plaza Hotel Fire Litigation, 859 F.2d at 1014 (quotation omitted); see Hickman, 329 U.S. at 511-13, in connection with the McCullen litigation, we hold that they constitute opinion work product, and were properly withheld from disclosure under the Right-to-Know Law.

To the extent that the plaintiffs argue that any work product privilege was waived because "the state of New Hampshire did not ultimately join other States in filing an amicus brief" in the McCullen litigation, we disagree. "The prevailing rule is that, because work product protection is provided against adversaries, only disclosing material in a way inconsistent with keeping it from an adversary waives work product protection." Bourne v. Arruda, Civil No. 10–cv–393–LM, 2012 WL 2891099, at *3 (D.N.H. July 16, 2012) (quotations and ellipsis omitted); see United States v. Massachusetts Institute of Technology, 129 F.3d 681, 687 (1st Cir. 1997). Based upon the record before us, we cannot say that the exchange of e-mail messages between the AG and such offices in other states was inconsistent with keeping those messages, and the documents they referenced, from the plaintiffs in the buffer zone litigation. Having decided that these e-mail messages constitute attorney work product, we need not address whether they also constitute privileged attorney-client communications.

### C. Information Withheld on Privacy Grounds

The plaintiffs next assert that the State wrongfully withheld certain information on privacy grounds. The Right-to-Know Law specifically exempts from disclosure "files whose disclosure would constitute invasion of privacy." RSA 91-A:5, IV. This section of the Right-to-Know Law "means that financial information and personnel files and other information necessary to an individual's privacy need not be disclosed." Lamy v. N.H. Public Utils. Comm'n, 152 N.H. 106, 109 (2005) (quotation omitted).

We engage in a three-step analysis when considering whether disclosure of public records constitutes an invasion of privacy under RSA 91-A:5, IV. Id. First, we evaluate whether there is a privacy interest that would be invaded by the disclosure. Id. If no privacy interest is at stake, the Right-to-Know Law mandates disclosure. Id. Whether information is exempt from disclosure because it is private is judged by an objective standard and not by a party's subjective expectations. Id.

Next, we assess the public's interest in disclosure. Id. Disclosure of the requested information should inform the public about the conduct and activities of their government. Id.

Finally, we balance the public interest in disclosure against the government interest in nondisclosure and the individual's privacy interest in nondisclosure. Id. "When the exemption is claimed on the ground that disclosure would constitute an invasion of privacy, we examine the nature of the requested document and its relationship to the basic purpose of the Right-to-Know Law." N.H. Civil Liberties Union v. City of Manchester, 149 N.H. 437, 440 (2003) (quotation and ellipsis omitted).

The purpose of the Right-to-Know Law is to provide the utmost information to the public about what its "government is up to." Union Leader Corp. v. City of Nashua, 141 N.H. 473, 476 (1996) (quoting EPA v. Mink, 410 U.S. 73, 105 (1973) (Douglas, J., dissenting), superseded by statute on other grounds); see Department of Defense v. FLRA, 510 U.S. 487, 497 (1994) (explaining that "the only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to" (quotations and brackets omitted)). "[T]he central purpose of the Right-to-Know Law is to ensure that the Government's activities be opened to the sharp eye of public scrutiny, not that information about private citizens that happens to be in the warehouse of the Government be so disclosed." Lamy, 152 N.H. at 113 (quotation omitted); see U.S. Dept. of Justice v. Reporters Committee, 489 U.S. 749, 774 (1989) (same under FOIA). "If disclosing the information does not serve this purpose, disclosure will not be warranted even though the public may nonetheless prefer, albeit for other reasons, that the information be released." Lamy, 152 N.H. at 111 (quotation omitted).

"The party resisting disclosure bears a heavy burden to shift the balance toward nondisclosure." N.H. Civil Liberties Union, 149 N.H. at 440. Thus, in this case, our review focuses upon whether the State "has shown that the records sought will not inform the public" about the State's activities, "or that a valid privacy interest, on balance, outweighs the public interest in disclosure." Id. When the facts are undisputed, "we review the trial court's balancing of the

12

public's interest in disclosure and the interests in nondisclosure <u>de novo</u>." <u>Lamy</u>, 152 N.H. at 109 (quotation omitted).

The plaintiffs specifically challenge the State's decision to withhold the following on privacy grounds: (1) three DVDs; (2) correspondence regarding the DVDs (W33-35); (3) the names of employees contained in license renewal applications filed with the Board of Pharmacy (P31-56); and (4) information contained in documents from the Feminist Health Center (P105-20).

### 1. DVDs

The DVDs contain footage from several security cameras at the Manchester office of PPNNE. According to the State, it obtained the DVDs from PPNNE in connection with the buffer zone litigation.

The DVDs show three different views of the sidewalk adjacent to the PPNNE parking lot on July 10, 2014, and July 17, 2014, for a few hours on each day. The DVDs show individual protestors walking on the sidewalk. The protestors are shown talking to individuals, who appear to be in the parking lot and are not seen on camera. The parking lot is partially bordered by a fence. The protestors are shown walking on the sidewalk next to the parking lot. The DVDs do not show protestors in the parking lot or near the building entrance. The building entrance is on the opposite side of the parking lot from the sidewalk on which the protestors are shown walking.

The DVDs also show passersby walking on the sidewalk who have no apparent connection to PPNNE. Occasionally, individuals are shown walking into the parking lot, however, the nature of their connection to PPNNE, if any, is not obvious. The only individuals whose relationship to PPNNE is readily ascertainable from the DVD footage are the protestors.

The DVDs also show vehicles that are entering, exiting, or parked in the lot or adjacent to the lot. The license plates of some, but not all, of those vehicles are visible. The DVDs show only the entrance to the parking lot. They do not show the building entrance.

The trial court concluded that "the DVDs should be protected from disclosure based on concerns for the personal privacy of individuals depicted in the videos." The trial court found that the State had articulated "a valid privacy interest at stake—the identity of [PPNNE] patients and clients." It also found that the PPNNE patients and clients shown on the DVDs "have a privacy interest in the health care providers from whom they choose to seek treatment."

The trial court further found that there was no "sufficient specific public interest in the disclosure of the DVD footage." The trial court stated that it

could not "discern how the contents of th[e] DVDs would shed light on the activities and conduct" of the AG or of any other governmental entity. Accordingly, the trial court determined that "[t]he privacy interest[s] of individual[s] seeking treatment" from PPNNE substantially outweighed "this minor or nonexistent public interest."

We begin by assessing whether there is a privacy interest at stake. We conclude that the non-protesting individuals shown, or whose vehicles are shown, on the DVDs have at least some privacy interest in controlling the dissemination of the DVD footage. See id. at 110; see also Planned Parenthood v. Town Bd., 587 N.Y.S.2d 461, 463 (Sup. Ct. 1992) (concluding that disclosure of police department photos of members of "Operation Rescue" would not constitute an unwarranted invasion of privacy because "[t]hese individuals seek notoriety in order to highlight and publicize their position against abortion"). However, absent further fact-finding by the trial court, we cannot determine whether those individuals have a heightened privacy interest at stake in the nondisclosure of the DVD footage. Accordingly, we vacate the trial court's order upholding the State's decision to withhold the DVDs and remand for further proceedings consistent with this opinion.

"In our society, individuals generally have a large measure of control over the disclosure of their own identities and whereabouts." Lamy, 152 N.H. at 110 (quotation omitted); see National Ass'n of Retired Federal Emp. v. Horner, 879 F.2d 873, 875 (D.C. Cir. 1989). The United States Supreme Court has referred to this as an interest in retaining the "practical obscurity" of private information that may be publicly available, but difficult to obtain. Reporters Committee, 489 U.S. at 762 (quotation omitted). Thus, in Lamy, we recognized that residential customers of Public Service Company of New Hampshire had a privacy interest in controlling access to their names and home addresses, even though such information is "often publicly available." Lamy, 152 N.H. at 110; see FLRA, 510 U.S. at 500 (finding privacy interest in federal employees' home addresses even though they "often are publicly available through sources such as telephone directories and voter registration lists"); see also Reporters Committee, 489 U.S at 762, 771 (holding that an individual has a substantial privacy interest in maintaining the practical obscurity of his or her "rap sheet" even though events summarized therein "have been previously disclosed to the public").

Here, the non-protesting individuals shown, or whose vehicles are shown, on the DVDs have a privacy interest in controlling access to the DVD footage. See Lamy, 152 N.H. at 110; see also Advocates for Highway v. Federal Highway Admin., 818 F. Supp. 2d 122, 129 (D.D.C. 2011) (holding that drivers in a federal highway administration study had more than a de minimis privacy interest in their videotaped images because they revealed "personal details, captured up close and over a prolonged period of time, [which] are not generally available in the ordinary course of daily life"). Although the DVDs show views

14

from a public sidewalk, "the fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information." Reporters Committee, 489 U.S. at 770 (quotations omitted). We, thus, disagree with the plaintiffs who assert that "[t]here is no privacy interest in what can be seen from a public sidewalk."

The fact that vehicle license plate numbers are publicly displayed is similarly not dispositive of whether disclosure of the DVD footage implicates privacy interests. See Jones v. U.S. Dept. of Justice, C/A No. 0:09–2802–RBH– PJG, 2011 WL 704510, at *4 n.5 (D.S.C. Jan. 24, 2011) (observing that a license plate number "without any context or private information" does not constitute "a clearly unwarranted invasion of privacy as contemplated by FOIA"). The vehicles with visible license plates are shown entering, exiting, parked in, or near, the parking lot of a reproductive health care facility. If those vehicles belong to PPNNE patients, then the disclosure of the DVDs reveals an intimate detail about their lives — namely, that they sought medical treatment at PPNNE. See National Sec. News Service v. U.S. Dept. of Navy, 584 F. Supp. 2d 94, 96 (D.D.C. 2008) (ruling that the patients listed in hospital admission records "have a substantial privacy interest in avoiding disclosure of the fact that they sought medical treatment"); cf. Mans v. Lebanon School Bd., 112 N.H. 160, 164 (1972) (ruling that, in light of the legislature's finding that disclosure of the salaries of public school teachers is not a disclosure of "intimate details," such a disclosure does not "constitute an invasion of privacy" (quotations omitted)). If those vehicles belong to PPNNE employees, then disclosure of the DVDs could subject the employees to harassment. See Sensor Systems Support, Inc. v. F.A.A., 851 F. Supp. 2d 321, 333 (D.N.H. 2012). On the other hand, if those vehicles belong to PPNNE vendors, then disclosure of the DVDs does not implicate heightened privacy concerns. See Lamy, 152 N.H. at 109 (analyzing whether the business customers of a public utility have a privacy interest in the nondisclosure of their names and addresses).

Absent additional information about the individuals shown, or whose license plates are shown, on the DVDs, we cannot assess whether, in fact, the DVDs implicate heightened privacy concerns. Nor can we determine the weight to be given to the privacy interests at stake. Accordingly, it would be premature for us to analyze whether there is a public interest in disclosure of the DVDs and, if so, to balance that interest against the privacy interests in nondisclosure. See id. at 109-10 (explaining that "[a]bsent a privacy interest, the Right-to-Know Law mandates disclosure"). Rather, we vacate the trial court's order upholding the State's decision to withhold the DVDs and remand for additional fact-finding and any further proceedings the trial court deems proper. In those additional proceedings, the parties may address whether the trial court should require the redaction of the DVD footage so as to allow its disclosure without compromising the privacy interests of the non-protesting individuals shown, or whose vehicles are shown, on the DVDs. Cf. DeVere v.

15

State of N.H., 149 N.H. 674, 675-79 (2003) (upholding the determination by the trial court that disclosing the names and home towns of drivers with low-digit license plates did not constitute an unwarranted invasion of privacy because the plaintiff had been ordered not to publish or disclose the information or to contact the drivers and because individuals with low-digit license plates were given an opportunity to opt out of the disclosure).

### 2. Correspondence About the DVDs

The correspondence about the DVDs consists of an undated envelope addressed to the AG from a Concord law firm and pieces of mostly blank paper demonstrating that the envelope contained the DVDs. The trial court ruled that this correspondence was properly withheld for the same reasons as the DVDs themselves. We conclude that, in so ruling, the trial court erred. The State does not argue that the correspondence implicates any privacy concerns. Accordingly, it was not properly withheld on that basis. "If no privacy interest is at stake, then the Right-to-Know Law mandates disclosure." Prof'l Firefighters of N.H. v. Local Gov't Ctr., 159 N.H. 699, 707 (2010).

### 3. Individuals' Names on Licensing Documents

#### a. Documents

The documents at issue are applications for the renewal of limited retail drug distributor licenses for the July 1, 2014 to June 30, 2015 licensing period, filed with the Board of Pharmacy by the Claremont, Derry, Exeter, Keene, Manchester, and West Lebanon offices of PPNNE and the Greenland office of the Feminist Health Center. Such licenses allow the clinics to distribute medication without a pharmacist on site.

Each application lists the name and location of the clinic, its telephone and fax numbers, whether the clinic's "specialty" is family planning or sexually transmitted disease prevention or some other specialty, whether it proposes to administer or dispense non-controlled drugs, its hours of operation, the address and telephone number of its medical director, the job title of the person in charge of drug purchasing, drug dispensing records, and the security provided at the particular clinic. It requires the signature, under penalties of perjury, of the responsible party. The PPNNE applications are signed by the Chief Financial Officer of PPNNE; the Feminist Health Center application is signed by the center's executive director.

On each of the PPNNE license renewal applications, the State has redacted the names of PPNNE's site managers, medical directors, and consultant pharmacists. In place of names, the State has inserted titles, such as "Medical Director" or "Licensed Pharmacist," or the name "John Doe," and a

16

corresponding number designation so that the plaintiffs could identify whether individuals worked at more than one reproductive health care facility.

The Feminist Health Center application includes the name of the site manager but does not include the name of the medical director, registered nurse, or consultant pharmacist. The medical director, registered nurse, and licensed pharmacist are identified as "Medical Director #2," "Registered Nurse #1," and "Licensed Pharmacist #2," respectively.

### b.  Prior State Litigation

The 2012-2013 renewal applications submitted by PPNNE locations were the subject of prior state court litigation between plaintiff New Hampshire Right to Life and the Board of Pharmacy. In that litigation, as in the instant litigation, in response to requests under the Right-to-Know Law, the State provided copies of PPNNE's license renewal applications with the names of PPNNE's site managers, medical directors, and consultant pharmacists for its Claremont, Derry, Exeter, Keene, and Manchester locations redacted for privacy reasons. The Superior Court (McNamara, J.) concluded that the State had "met its burden to demonstrate that there is a privacy interest at stake in the disclosure of the identities of PPNNE's site managers, consultant pharmacists, and medical directors," because such individuals "have a privacy interest in their identities." The court observed that the "release of their identities could result in harassment, from any member of the public, and/or safety concerns."

With respect to the public interest in disclosure, the court concluded that "[d]isclosing the names of the employees and independent contractors at issue only provides . . . limited information" with regard to the activities of the Board of Pharmacy. In response to the assertion that the public had an interest in knowing "how PPNNE spends the tax money it receives through subsidies," the court noted that "PPNNE has not received any State subsidies since 2011 and has ceased receiving Federal subsidies beginning January 1, 2013." Accordingly, the court denied the request for the names of site managers, medical directors, and consultant pharmacists listed in PPNNE's applications for renewed licenses to distribute medication without a pharmacist on site, but it ordered the State to "provide copies of [those] applications with said employees labeled appropriately as John Doe 1, John Doe 2, Jane Doe 1, etc." This decision was not appealed.

### c.  Current Litigation

Like the court in the prior state litigation, the trial court in this case found that the individuals whose names are redacted have a privacy interest "in their identities and safety." The court concluded that "[t]his privacy interest" was "not negated by [the plaintiffs'] arguments." The trial court then

17

determined that there was only "an attenuated public interest in the specific identities of employees." The trial court found that "[e]ven assuming that some [PPNNE] salaries are being paid by . . . state grant funds, [the plaintiffs have] not articulated how knowing the identities of particular employees who may or may not be paid with state funding would shed light on the [Board of Pharmacy's] or . . . DHHS's operations except with respect to how these agencies are enforcing RSA 318:42, VII." Because it found that the privacy interest was "substantial" and the public interest in disclosure was "attenuated," the court determined that disclosure of individual employee and independent contractor names is not required by the Right-to-Know Law. However, because "regulatory requirements . . . specify that a clinic must identify its consultant pharmacist and medical director on the [license renewal] application," the court decided that "disclosure of such persons' professional designation (e.g., M.D. or R.N.) would suffice to demonstrate the extent to which [the Board of Pharmacy] is approving [license renewal] applications according to law."

### d.  Analysis

#### 1.  Privacy Interest

We agree with the trial court that individuals whose names were redacted have a privacy interest in the nondisclosure of their identities as employees or independent contractors of the reproductive health care facilities.

"Under some circumstances, individuals retain a strong privacy interest in their identities, and information identifying individuals may be withheld to protect that privacy interest." Sensor Systems Support, Inc., 851 F. Supp. 2d at 333. One such circumstance is when public identification "could conceivably subject" those identified to "harassment and annoyance in the conduct of their official duties and in their private lives." Id. (quotations omitted); see also Lesar v. United States Dept. of Justice, 636 F.2d 472, 487 (D.C. Cir. 1980) (FBI agents and informants involved in investigating Dr. Martin Luther King, Jr. have a privacy interest in the nondisclosure of their names because publicly identifying them "conceivably could subject them to annoyance or harassment in either their official or private lives"); Bigwood v. U.S. Agency for Intern. Development, 484 F. Supp. 2d 68, 77 (D.D.C. 2007) (concluding that "a person avoiding harm to his life or liberty has a clear interest in the withholding" of information that would identify him publicly (quotation omitted)); cf. National Archives and Records Admin. v. Favish, 541 U.S. 157, 171 (2004) (citing Lesar with approval); National Sec. News Service, 584 F. Supp. 2d at 96 (ruling that, in the context of a request for individual names contained in hospital admission records, "the privacy interest of an individual in avoiding the unlimited disclosure of his or her name is significant" (quotations and ellipsis omitted)). Indeed, as one court has observed, "individuals have an even stronger privacy interest in avoiding physical danger

than in the accepted privacy interest in the nondisclosure of their names and addresses in connection with financial information." Bigwood, 484 F. Supp. 2d at 77 (quotation omitted); see Judicial Watch, Inc. v. Food & Drug Admin., 449 F.3d 141, 153 (D.C. Cir. 2006).

The plaintiffs argue that the record does not support the trial court's finding that the clinic employees have a privacy interest in their "identities and safety." To the contrary, the record includes a police incident report from March 2013 regarding a "Pro-life Protest Event" in which "somewhere between 150 and 200" individuals protested at the entrance to PPNNE's Manchester office. (Bolding omitted.) The report indicates that the sidewalk around the perimeter of the office was "congested" and that the employee entrance was "somewhat obstructed by [a] circulating group of protester[s]." Additionally, the plaintiffs' own exhibits include a newspaper article regarding New Hampshire Right to Life's 2015 "March for Life" in Concord, in which "hundreds of supporters from across the state . . . marched down Main Street past the Concord Feminist Health Center." When it passed the buffer zone statute in 2014, the New Hampshire Legislature found that "[r]ecent demonstrations outside of reproductive health care facilities have caused patients and employees of these facilities to believe that their safety and right to privacy are threatened." Laws 2014, 81:1.

Moreover, as one court has recognized, the "history of violence associated with the provision of [such] services is undeniable." Glenn v. Maryland Dept. of Health and Mental Hygiene, 132 A.3d 245, 251 (Md. 2016); see Judicial Watch, Inc., 449 F.3d at 153 (holding that the agency "fairly asserted abortion-related violence as a privacy interest for both the names and addresses of persons and businesses" associated with the approval of an abortion-related drug). The record includes a 2013 declaration from the director of health center operations for PPNNE describing "a series of recent incidents involving threats and/or harassment of PPNNE employees." In one incident, "anti-abortion protestors took photographs and video recordings of staff and patients." In another, an activist entered a PPNNE clinic, asked to speak to someone about "baby killing," and, while pointing at a PPNNE staff member, stated that PPNNE employees "would go to hell." (Quotation omitted). The declaration averred that the incidents at PPNNE "are part of a larger pattern of threats, harassment, and sometimes physical violence, including murder," and described some of the more recent examples of such conduct in Arizona and Florida.

Given evidence of the protests at the Manchester PPNNE office and the Concord Feminist Health Center and evidence of "the history nationally of harassment and violence associated with the provision of abortion services," Glenn, 132 A.3d at 253, we cannot agree with the plaintiffs that the trial court's finding that the individuals at issue have a privacy interest in their identities and safety is based upon mere speculation. See id. at 252-53

(finding that the "risk of violence is not speculative and is based on the ample evidence presented" where affidavit "presented facts regarding the history of violence that is associated too frequently with a career in providing surgical abortion services" and facts regarding events in Maryland, including an incident in which anti-abortion protestors appeared "at the middle school of a child of the landlord of a surgical abortion facility" (quotation omitted)).

The plaintiffs assert that because the identities of the individuals whose names were redacted "have been publicly disclosed by the clinics themselves" in newspaper articles, the "State cannot assert a privacy interest" on behalf of the clinics and their employees. However, the record on appeal does not support the plaintiffs' underlying factual assertion. The articles contained in the record do not include the names of any of the individuals whose names were redacted on the documents at issue. Further, according to the director of health center operations for PPNNE, "employee information, including provider and staff names, is not public record," and "[p]roviders and staff are not identified on PPNNE's website or in other publicly-disclosed materials." See Planned Parenthood of Northern New England, https://www.plannedparenthood.org/planned-parenthood-northern-new-england (last visited May 4, 2016). More importantly, even if the names of the individuals at issue had been previously made available to the public, "prior revelations of exempt information do not destroy an individual's privacy interest." Moffat v. U.S. Dept. of Justice, 716 F.3d 244, 251 (1st Cir. 2013); see FLRA, 510 U.S. at 500 (explaining that "[a]n individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form").

## 2. Public Interest

We also agree with the trial court that the public interest in the names of the individuals at issue is attenuated at best. The plaintiffs argue that "the identities of the individuals being granted an exemption by the Board of Pharmacy to dispense prescription drugs without a pharmacist will inform the public whether the Board of Pharmacy is properly applying RSA 318:42(VII)." The trial court concluded that "disclosure of such persons' professional or licensing designation is sufficient to demonstrate the extent to which the [Board of Pharmacy] is approving [licensing] applications according to the law." We agree.

RSA 318:42, VII allows registered nurses "in clinics of nonprofit family planning agencies under contract with [DHHS]" to dispense non-controlled prescription drugs provided that certain conditions are met, including that the clinic "possesses a current limited retail drug distributor's license." RSA 318:42, VII(d). Disclosure of the names of PPNNE's site managers, medical directors, and consultant pharmacists at each of the six clinics does not

20

further the public interest in assuring that the requirements of RSA 318:42, VII are met.

The plaintiffs also assert that disclosure of the names of individuals on the license renewal applications is necessary to show "who is running" the clinics and "whose salary is being paid by taxpayer funds," and to allow the public to discover whether there is "corruption, incompetence, inefficiency, prejudice and favoritism" at the Board of Pharmacy. (Quotation omitted.) To support these assertions, the plaintiffs rely upon Professional Firefighters, 159 N.H. at 709. That reliance is misplaced.

At issue in Professional Firefighters was whether, under the Right-to-Know Law, the Local Government Center, Inc. (LGC) could be compelled to disclose the names and salaries of its employees. Prof'l Firefighters of N.H., 159 N.H. at 702. LGC conceded that it was "a governmental entity subject to the Right-to-Know Law." Id. at 709. Although LGC argued that its employees were private, and not public, employees, we disagreed, explaining that "[w]hether records are subject to public disclosure depends upon whether the entity itself is subject to the Right-to-Know Law." Id. at 706-07. We also rejected LGC's assertion that the employees' privacy interest in nondisclosure outweighed the public interest in disclosure. Id. at 707-10. We explained that, because LGC is a governmental entity and because "the bulk of [its] income" comes from public funds, public access to the requested information directly served "the very purpose underlying the Right-to-Know Law." Id. at 709. Public access to the salary information allowed scrutiny of "how a public body is spending taxpayer money in conducting public business." Id.; see Union Leader Corp. v. N.H. Retirement Sys., 162 N.H. 673, 684 (2011) (holding that disclosure of records related to the retirement benefits of public employees is required by the Right-to-Know Law because "[t]he public has an interest both in knowing how public funds are spent and in uncovering corruption and error in the administration" of the New Hampshire Retirement System, which is a public body, administering public funds).

PPNNE is a private, non-profit organization, not a governmental entity like LGC. See Right to Life, 778 F.3d at 49. In addition, there is no evidence in the record that PPNNE, like LGC, receives the "bulk" of its income from public funds. Prof'l Firefighters of N.H., 159 N.H. at 709. Moreover, the record does not demonstrate that State funds pay the salaries of any of the employees whose names were redacted. In contrast to Professional Firefighters, disclosure of the individual employee names in this case would reveal nothing about the government and its activities. See id. Therefore, any asserted public interest in the names of PPNNE employees is attenuated.

21

### 3. Balancing

Because the public interest in disclosing the names of PPNNE employees is, at best, attenuated and is based upon the plaintiffs' "hypothetical assessment" of the Board of Pharmacy's performance, Lamy 152 N.H. at 113, and because PPNNE employees have a cognizable privacy interest in nondisclosure that outweighs such a negligible and speculative public interest, we conclude that disclosure is not required by the Right-to-Know Law. See id.; see also Favish, 541 U.S. at 174 (concluding that when information is sought to show that an agency acted negligently, requester must produce "evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred"); Right to Life v. Dept. of Health & Human Svcs., 976 F. Supp. 2d 43, 64 (D.N.H. 2013), aff'd, 778 F.3d 43 (1st Cir.), cert. denied, 136 S. Ct. 383 (2015).

### 4. Feminist Health Center Documents

#### a. Financial Documents

The plaintiffs next assert that the trial court wrongfully upheld the State's redaction of monetary amounts contained in financial documents of the Feminist Health Center. Those documents are: (1) a document that lists the assets and liabilities of the Feminist Health Center for calendar year 2010 (P105-06); (2) a document that shows the center's income and expenses for calendar year 2010 (P107-09); (3) a document that lists the center's cash flow from operating, investing, and financing activities, the net increase/decrease in cash during the year, how much was paid for interest, and how much was paid for income taxes (P110-11); and (4) two copies of the same budget form for the budget period July 1, 2012, to June 30, 2013, submitted with a request for "STD/HIV/HCV Clinical Services" and "HIV/HCV Targeted Testing" (P119-20).

The trial court found that the center "has a privacy interest in the redaction of [the] financial information as it relates to [the center's] commercial activities and competitive stance in the market relative to other health clinics." The court found that the public had an interest to the extent that the clinic received State money, but that "even assuming that the clinic received [such] funding during [the] time periods" reflected on the documents, "the financial documents do not provide information about how the state grant money specifically was spent." Accordingly, the court concluded, because these documents "primarily show the conduct of the clinic," and "not any government conduct," the State had properly redacted them.

The plaintiffs declare, without any analysis, that the Feminist Health Center has "little or no privacy interest" in the monetary amounts listed on the financial documents. Such a bare assertion is not a sufficiently developed argument. See Wyles v. Lees, 162 N.H. 406, 414 (2011). Accordingly, we

22

uphold the trial court's determination.  See Right to Life, 778 F.3d at 47, 50-51 (upholding trial court's determination that PPNNE's Manual of Medical Standards and Guidelines, a letter describing the manual, policies about collecting and setting fees, and a document outlining PPNNE's operations and fees were exempt from disclosure as confidential commercial information).

With regard to the public interest in disclosure, the plaintiffs argue that the trial court erred when it held that the financial documents "primarily show the conduct of the clinic, not any government conduct."  (Quotation omitted.) We find no error in the trial court's interpretation of the financial documents. As the trial court found, the documents do not demonstrate how State grant money was spent.  Given the center's strong privacy interest in nondisclosure and the relatively weak public interest in disclosure, we conclude that the State has met its heavy burden of demonstrating that the financial information is exempt from disclosure under the Right-to-Know Law.

### b.  Other Documents

The plaintiffs also challenge the redactions of individual names from certain other produced documents from the Feminist Health Center:  (1) a June 2012 list of board members (P113); (2) a form identifying the clinic's key administrative personnel for fiscal years 2013 and 2014 (key administrative personnel form) (P114); (3) the resume of the center's director of STD/HIV and outreach services (P117); and (4) the resume of the center's staff nurse (P118).[4] Although individual home addresses and private telephone numbers were also redacted from some of these documents and from the resume of the center's executive director (P115), the plaintiffs appear to concede that redaction of an individual's home address was lawful, and do not argue that the State was required to disclose an individual's private telephone number.  Thus, we confine our analysis to the redactions of names from these documents.

The trial court found that individual board members and employees had a privacy interest in their identities and their association with the Feminist Health Center.  Because the court did not find a sufficient public interest in disclosing the names from employee resumes, it upheld the redaction of those names.  With regard to board members, the court found that the asserted public interest in disclosing the names was not entitled to great weight.  See Lamy, 152 N.H. at 111-13.  Thus, the court found that the board members' privacy interest outweighed any public interest in the disclosure of their names, and upheld the redaction of names from the board member list.

---

[4] Although in their January 12, 2016 letter to this court, the plaintiffs identified documents bates-stamped P112 and P116 as being at issue in this appeal, the record indicates that those documents were produced without redaction.  Moreover, the plaintiffs have not included those documents in the record on appeal and have not briefed any argument about them.  Accordingly, we deem any such argument to be waived.  See Aubert, 129 N.H. at 428.

With respect to the key administrative personnel form, the court found that there "is a privacy interest at stake in the disclosure of this information as these employees work for a private entity that is not itself subject to the Right-to-Know Law." However, the court also found that the public had "some interest in the finances of the clinics that receive state grant funding because taxpayer dollars are flowing to the entity and funding certain services." The court determined that because the Feminist Health Center is not a governmental entity or a "surrogate[ ]" thereof, the public need not know the names of the individuals holding the positions at issue, but that the public did have a right to know the salaries associated with those positions. Thus, the court ordered the State to redact the individuals' names, but to disclose the salary information.

### 1. Privacy Interest

We begin by assessing whether the individuals have a privacy interest in the nondisclosure of their names. The individuals at issue, like the PPNNE employees whose names were redacted from the license renewal applications submitted to the Board of Pharmacy, have a cognizable privacy interest in controlling the dissemination of their names and their connection to the Feminist Health Center. See Sensor Systems Support, Inc., 851 F. Supp. 2d at 333.

### 2. Public Interest

We next address the public interest in disclosure of the names of the individuals. The public interest that matters for the Right-to-Know Law is whether disclosure of the otherwise private information will provide the public "the utmost information . . . about what its government is up to." Lamy, 152 N.H. at 111 (quotation omitted). Here, the disclosure of the individuals' names will not tell the public anything directly about what the State "is up to." Id. (quotation omitted). The disclosure of these names will reveal nothing about the State's own conduct. See id.; see also Right to Life, 976 F. Supp. 2d at 62-64 (ruling that federal agency had met its burden to justify nondisclosure of the names and other identifying information of PPNNE middle- and lower-level employees when such employees "do not even work for the federal government, but for a private organization that receives part of its funding from the federal government," and the court could not "conceive of[] any public interest in that kind of information").

"The asserted public interest" upon which the plaintiffs rely for disclosing the names "stems not from the disclosure of the redacted information itself, but rather from the hope that [the plaintiffs], or others, may be able to use that information to obtain additional information outside the Government files." Department of State v. Ray, 502 U.S. 164, 178 (1991); see Lamy, 152 N.H. at 111-12. The plaintiffs argue that there is "a great public interest" in disclosing

24

the names of the individuals because doing so will enable the public to scrutinize whether the individuals have contributed to political campaigns and whether those contributions have resulted in the State "showing undue favoritism" to the Feminist Health Center. This kind of public interest is derivative, and in <u>Lamy</u>, we held that when, as in this case, "the sole public interest in disclosing the information" is derivative, it is entitled to little weight. <u>Lamy</u>, 152 N.H. at 113.

### 3. Balancing

Because the only public interest in disclosing the names of the individuals is derivative and because these individuals have a cognizable privacy interest in nondisclosure that outweighs such a negligible public interest, we conclude that disclosure is not required by the Right-to-Know Law. <u>See</u> <u>id</u>.; <u>see</u> <u>also</u> <u>Favish</u>, 541 U.S. at 174.

### D. Specificity of State's Responses

The plaintiffs next argue that the trial court erred when it failed to conclude that the State's initial responses to the plaintiffs' Right-to-Know requests violated RSA chapter 91-A. The State counters that the plaintiffs have "confuse[d] the requirements for an agency's initial response to a Right-to-Know request under RSA 91-A:4 with the requirements for a[ ] <u>Vaughn</u> [i]ndex." <u>See</u> <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973). "Generally, a <u>Vaughn</u> index . . . include[s] a general description of each document withheld and a justification for its nondisclosure." <u>Union Leader Corp.</u>, 142 N.H. at 548. The State contends that its initial responses to the plaintiffs' requests complied with RSA 91-A:4, IV (2013) and that greater specificity is not required by that statute. We agree with the State.

RSA 91-A:4, IV provides that, when denying a request to produce a public record for inspection and copying, a public body or agency need only put the denial "in writing" and provide "reasons" for the denial. As the trial court found, and as the record supports, "[i]n response to each Right-to-Know request, . . . the State cited statutory provisions, case law, or applicable privileges indicating the exemption or other reason for non-disclosure." Although a <u>Vaughn</u> index requires more specificity than the State provided in its initial responses, the State was not required to provide such an index in this case. <u>See</u> <u>Murray v. N.H. Div. of State Police</u>, 154 N.H. 579, 583 (2006) (explaining that an agency "is not required . . . to justify its refusal [to disclose] on a document-by-document basis" and that "[w]hile . . . the preparation of a <u>Vaughn</u> index may be sufficient to justify an agency's refusal to disclose," doing so is not "necessarily required"). We, therefore, uphold the trial court's implicit ruling that the State's written responses to the plaintiffs' Right-to-Know requests satisfied the requirements of RSA 91-A:4, IV.

The plaintiffs next assert that the court erred "in only requiring the State to provide [them] with a table of contents of withheld documents two months after the February 2, 2015 deadline" for briefing, and in finding that the entries in the table were sufficiently specific. (Emphasis omitted.) We decline to address this assertion substantively because the plaintiffs have not demonstrated that they preserved it for our review. See J & M Lumber & Constr. Co. v. Smyjunas, 161 N.H. 714, 718 (2011). It is the burden of the appealing party, here the plaintiffs, to demonstrate that they raised their issues before the trial court. See Bean v. Red Oak Prop. Mgmt., 151 N.H. 248, 250, (2004).

On March 27, 2015, the trial court ordered the State to provide it "with two parallel packets of documentation, one as redacted and the other as unredacted." The order required that each packet "contain readily identifiable and parallel page numbering" and include "a table of contents which identifies the documents by a reasonable brief description and by reference to the numbering stamp numbers or equivalent numbering." The State was ordered to provide the table of contents to the court and to the plaintiffs.

To the extent that the plaintiffs believed that the trial court erred by ordering the State to provide the table and by finding its entries to be sufficiently specific, it was incumbent upon them to so inform that court. See LaMontagne Builders v. Bowman Brook Purchase Group, 150 N.H. 270, 274 (2003); N.H. Dep't of Corrections v. Butland, 147 N.H. 676, 679 (2002). However, the record submitted on appeal does not demonstrate that the plaintiffs ever informed the court, in a motion for reconsideration or otherwise, that the trial court erred by requiring the State to provide a table of contents or in finding the entries in that table to be sufficiently specific. Thus, because the plaintiffs have failed to demonstrate that they preserved their argument regarding the table of contents for our review, we decline to review it substantively. See Smyjunas, 161 N.H. at 718.

E. Costs and Attorney's Fees

The plaintiffs next contend that the trial court erred by failing to award them attorney's fees and costs. We first address their request for attorney's fees.

RSA 91-A:8 governs remedies for violations of the Right-to-Know Law. RSA 91-A:8 (2013). Under RSA 91-A:8, I, attorney's fees shall be awarded to a plaintiff if the trial court finds that: (1) "such lawsuit was necessary in order to make the information available"; and (2) "the public body, public agency, or person knew or should have known that the conduct engaged in was a violation of RSA chapter 91-A." Prof'l Firefighters of N.H., 159 N.H. at 710 (quotations and brackets omitted). We will defer to the trial court's findings of

fact unless they are unsupported by the evidence or erroneous as a matter of law. Id.

The plaintiffs argue that they are entitled to fees because: (1) the Director, Charitable Trusts Unit (CTU) took 12 weeks to provide them with the financial records they requested; (2) with regard to the buffer zone litigation documents, the State "repeatedly refused to provide reasons for its withholdings until ordered by the Superior Court in April 2015"; and (3) the State knew or should have known that its conduct violated RSA chapter 91-A. The plaintiffs contend that "[t]he State's failure to provide the hundreds of pages of financial records until 12 weeks after the request and [its] failure to identify the documents it was withholding and the reasons for the withholding until 9 months after [the] request were both knowing violations of RSA 91-A," and entitled them to an attorney's fee award.

The trial court rejected these arguments. With regard to the CTU, the court found that, although the CTU had received one of the requested documents in August 2014, "it is unclear when [it received] the other documents responsive to the [plaintiff's September 11, 2014] request." The court further found that the CTU produced the responsive documents in December 2014, "upon completion of the agency's internal processing." The court concluded that "[a]lthough this lawsuit was pending at the time of production," it was not "necessary in order to enforce compliance." (Quotation omitted.) We uphold these factual findings because the plaintiffs have failed to persuade us that the record does not support them or that they are legally erroneous. See id. The trial court, having found that the plaintiffs' lawsuit was not necessary to enforce the CTU's compliance with RSA chapter 91-A, did not err by denying the plaintiffs attorney's fees with regard to the documents requested from the CTU. See ATV Watch, 155 N.H. at 442.

With regard to the buffer zone litigation documents, the trial court found that, contrary to the plaintiffs' assertions, the State sufficiently justified "its exemptions and withholdings" by citing "statutory provisions, case law, or applicable privileges indicating the exemption or other reason for non-disclosure." The record supports this finding. As previously discussed, no more was required under RSA 91-A:4. See RSA 91-A:4, IV. Thus, the trial court correctly denied the plaintiffs' attorney's fee request with regard to the State's production of the buffer zone litigation documents.

With regard to the State's response in general, the trial court found that although it had "concluded that certain redactions or withholdings by the State did not meet Right-to-Know requirements, they were not so unreasonable under current New Hampshire case law that the State knew or should have known that disclosure was required." The court, therefore, found that the plaintiffs were "not entitled to an award of reasonable attorney's fees as a consequence of the specific disclosures mandated by [its] order." We concur

with this reasoning. We hold, based upon "the record, the trial court's findings, and the law in this area," that the State "neither knew nor should have known that its conduct violated the statute." Goode v. N.H. Legislative Budget Assistant, 145 N.H. 451, 455 (2000). Accordingly, we hold that the trial court properly denied the plaintiffs' request for attorney's fees. See id.

We next address the plaintiffs' request for costs. The trial court denied the plaintiffs costs because they had "not specifically requested" such an award. Even if we assume without deciding that the trial court erred in this respect, we affirm its denial of costs. See Catalano v. Town of Windham, 133 N.H. 504, 508 (1990) (explaining that "when a trial court reaches the correct result, but on mistaken grounds, [we] will sustain the decision if there are valid alternative grounds to support it." (quotation and brackets omitted)).

The plaintiffs argue that they are entitled to costs, as a matter of law, because "[t]he Superior Court found that the State violated RSA 91-A in responding to [their] right to know requests in several respects." However, under RSA 91-A:8, I, the trial court must award costs to a plaintiff only when it "finds that [the plaintiff's] lawsuit was necessary in order to enforce compliance with," or "to address a purposeful violation of," the Right-to-Know Law. RSA 91-A:8, I; see ATV Watch, 155 N.H. at 439 (explaining that costs must be awarded if State violated the Right-to-Know Law "and a lawsuit was necessary in order to make the information available"). As previously discussed, the trial court found, and the record supports its finding, that the plaintiffs' lawsuit was not necessary to enforce compliance with RSA chapter 91-A. Therefore, we uphold the trial court's denial of costs to the plaintiffs.

> Affirmed in part; reversed in part; vacated in part; and remanded.

DALIANIS, C.J., and CONBOY and LYNN, JJ., concurred.

28