# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2019-0217, <u>Marianne Salcetti & a. v. City of Keene</u>, the court on June 3, 2020, issued the following order:**

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case. The petitioners, Professor Marianne Salcetti and her journalism students at Keene State College — Colby Dudal, Alex Fleming, Meridith King, Grace Pecci, and Abbygail Vasas — appeal several orders of the Superior Court (<u>Ruoff</u>, J.) granting, in part, and denying, in part, their petition under the Right-to-Know Law, RSA chapter 91-A (2013 & Supp. 2019). The petitioners argue that the trial court erred when it: (1) interpreted certain of their Right-to-Know requests filed with the respondent, the City of Keene, as requests for "lists"; (2) found that the City conducted a reasonable search for certain requested records; (3) allowed the City to withhold and redact certain information regarding citizen complaints of excessive force used by City police officers; (4) upheld the City's proposed $300 charge for access to certain records; (5) found that the petitioners lacked standing to challenge the City's requirement that requesters submit signed, written requests; and (6) found that the City's response times to the requests were reasonably necessary. We affirm, in part, reverse, in part, vacate, in part, and remand.

The pertinent facts are as follows. In the Fall of 2017, Salcetti taught a journalism class at Keene State College during which she instructed her students to file Right-to-Know requests with public entities seeking information on topics of public interest. Several of these requests were submitted to the City, and five of them were denied in full or in part. In December 2017, Salcetti, as a non-attorney representative for her students, see <u>Super. Ct. Civ. R.</u> 20, filed a petition in the superior court requesting that the court order the City to fulfill the students' Right-to-Know requests. The trial court held a hearing in June 2018, and issued a series of orders in August 2018, December 2018, and January 2019, which resolved the issues raised by the petitioners primarily in favor of the City. The petitioners filed a motion to reconsider. The motion was denied, and this appeal followed.

Resolution of this appeal requires that we interpret the Right-to-Know Law, RSA chapter 91-A. "The ordinary rules of statutory construction apply to our review of the Right-to-Know Law." <u>N.H. Right to Life v. Dir., N.H. Charitable Trusts Unit</u>, 169 N.H. 95, 102-03 (2016) (quotation omitted). Thus, "we are the final arbiter of the legislature's intent as expressed in the words of

the statute considered as a whole." Id. at 103 (quotation omitted). "When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used." Id. (quotation omitted). "We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." Id. (quotation omitted). "We also interpret a statute in the context of the overall statutory scheme and not in isolation." Id. (quotation omitted).

The purpose of the Right-to-Know Law "is to ensure both the greatest possible public access to the actions, discussions and records of all public bodies, and their accountability to the people." RSA 91-A:1 (2013). "Thus, the Right-to-Know Law furthers our state constitutional requirement that the public's right of access to governmental proceedings and records shall not be unreasonably restricted." N.H. Right to Life, 169 N.H. at 103 (quotation omitted); see also N.H. CONST. pt. I, art. 8. "Although the statute does not provide for unrestricted access to public records, we resolve questions regarding the Right-to-Know Law with a view to providing the utmost information in order to best effectuate these statutory and constitutional objectives." N.H. Right to Life, 169 N.H. at 103 (quotation omitted). "As a result, we broadly construe provisions favoring disclosure and interpret the exemptions restrictively." Id. (quotation omitted). "We also look to the decisions of other jurisdictions interpreting similar acts for guidance, including federal interpretations of the federal Freedom of Information Act (FOIA)." Id. "Such similar laws, because they are in pari materia, are interpretatively helpful, especially in understanding the necessary accommodation of the competing interests involved." Id. (quotation omitted).

"When a public entity seeks to avoid disclosure of material under the Right-to-Know Law, that entity bears a heavy burden to shift the balance toward nondisclosure." Id. (quotation omitted). "We review the trial court's statutory interpretation and its application of law to undisputed facts de novo." Id.

## I. Interpretation of the Right-to-Know Requests

The petitioners first argue that the trial court erred when it interpreted the Right-to-Know requests filed by Dudal, Fleming, and Vasas as requests for "lists," rather than as requests for the responsive governmental records themselves. The City counters that the trial court did not err in finding that the students had requested "lists," and that the City is not required to compile, cross-reference, or assemble governmental records into a form that does not already exist. We examine each student's request in turn.

We first consider Dudal's Right-to-Know request. On September 26, 2017, Dudal hand-delivered a request to the City seeking "[a] list of the . . . food establishments that are a part of license class I, license class II, and

license class III in Keene that received a score of less than 85" during a specified time period, and "[a] list of the violations for any and all food establishments that are a part of license class I, license class II, and license class III in Keene that received scores of 85 or less, and the checklist of the inspection accompanying each score," during the same time period. The City's deputy clerk and records manager, William Dow, acknowledged receipt of the request the following day. On October 4, Dudal called Dow, who instructed him to contact the City's Code Enforcement Department regarding his request. On October 5, Dudal e-mailed a second Right-to-Know request to the Code Enforcement Department. This request sought "[a]ll food establishments' scores and dates of inspections for the city of Keene, NH within the past [three] years for food establishments that are in classes I, II and III," and "[t]he criteria in which the food establishments were scored and graded." Also on October 5, Dow notified Dudal that there were existing governmental records responsive to his request.

On October 19, Corinne Marcou, an administrative assistant at the City's Code Enforcement Department, e-mailed Dudal, stating that "[a]fter much conversation[] with William Dow and our City Attorney, the information from our data system isn't a government document and as there is no report currently created with this specific request criteria, the City isn't obligated to create one." On October 26, while at the Code Enforcement Department, Dudal was told that the information regarding food establishment inspections was not available because "food establishment records are kept in a database and no governmental records containing that information existed nor was [the City] required to create one."

The trial court found that "the 'records' [Dudal] seek[s] from the City are not existing records that the City keeps or maintains; the data compilations [he has] requested do not exist in a form [he] requested, but rather exist as uncollected data in a database, and for the data to be in a form that [he was] entitled to have, the City would need to create a new record." Thus, because "[t]he law is clear that a public body or agency has no obligation to create a 'list' of existing data," the trial court found that the City properly denied Dudal's requests.

We agree with the trial court's decision upholding the City's denial of Dudal's first request, which explicitly sought "lists" that were not compiled or maintained by the City. "[T]he statute does not require public officials to retrieve and compile into a list random information gathered from numerous documents, if a list of this information does not already exist." Brent v. Paquette, 132 N.H. 415, 426 (1989); see also RSA 91-A:4, VII (2013) ("Nothing in this chapter shall be construed to require a public body or agency to compile, cross-reference, or assemble information into a form in which it is not already kept or reported by that body or agency.").

However, we disagree that Dudal's second request was similarly deficient. Dudal's second request sought "[a]ll food establishments' scores and dates of inspections for the city of Keene, NH within the past [three] years for food establishments that are in classes I, II and III." In Dudal's second request, he did not seek a compiled list of information; rather, he sought governmental records that would themselves be responsive to his request. See RSA 91-A:4, IV (2013) (amended 2016 & 2019) (providing that a request need only "reasonably describe[]" the records sought). Thus, the trial court erred when it upheld the City's denial of Dudal's second request.

Next, we consider Fleming's Right-to-Know request. On September 25, 2017, Fleming e-mailed a request to the City seeking "[a]ll documents including, but not limited to, printed document and electronic documents police citations involving infractions pertaining to" RSA 179:10 (2014) (Unlawful Possession and Intoxication) and RSA 644:18 (2016) (Facilitating a Drug or Underage Alcohol House Party), from 2012 through 2016. On September 26, Dow acknowledged receipt of the request, informing Fleming that the City requires that requests be in writing and signed by the requester. Nonetheless, Dow stated that the City would begin to process the request. Thereafter, Fleming submitted a signed, written request seeking "documents . . . of police citations involving the total number of infractions" of the two statutes. (Emphasis added.)

On October 23, Fleming e-mailed Dow to inquire about the status of his request. Dow responded the following day, stating that, with regard to Fleming's request "received by this office on September 25, 2017[,] [t]he City . . . has determined that there is no existing governmental record listing all [such] citations." On November 20, Fleming appealed to Dow for an explanation, stating: "These are state laws. Shouldn't there be a record of when they are violated?" Dow responded the following day, stating that "[t]he Keene Police Department records all incidents and arrests in various recordkeeping systems maintained in their department," and that the "Police Department staff have reviewed the record systems . . . for a report listing all citations[,] . . . [and determined] that the requested governmental record does not exist."

The trial court found that "[i]t is clear from Mr. Fleming's written request that he sought documents reflecting the 'total number' of infractions, rather than the individual case files that would contain the 'infractions' themselves." Thus, the trial court upheld the City's denial of Fleming's request, finding that the City properly construed it as seeking a list of all such infractions, which was not a record maintained by the City.

On appeal, the petitioners argue that the trial court erred because "Dow did not ever receive [Fleming's second] request referring to the 'total number' [of

infractions] prior to denying Fleming's [first] request," and because Fleming's first request cannot reasonably be construed as seeking a "list." We agree.

The record reflects that the City's denial of Fleming's Right-to-Know request was premised solely upon his initial e-mailed request. On October 24, the City specifically denied Fleming's initial "September 25, 2017" request. The City's denial was part of the same e-mail chain as Fleming's initial request, and contained no reference to Fleming's second, written, request. Indeed, Dow confirmed in his affidavit submitted to the trial court that "Mr. Fleming's written request was never received." Therefore, the trial court erred when it looked to the language of Fleming's second request, which the City never received, to uphold the City's rejection of Fleming's first request, which contained no such "total number" language.

Additionally, we find that Fleming's first request could not reasonably be interpreted as seeking a list. Fleming sought "[a]ll documents including, but not limited to, printed document and electronic documents police citations involving infractions pertaining to" certain statutes during a certain time period. Thus, Fleming did not seek a list, but rather the responsive "documents" themselves. Indeed, after trial, the City admitted that Fleming's request "could have been interpreted differently by the City upon initial review, and that governmental records responsive to [his] request[] are contained in the City's Police Department files, subject to appropriate redaction." Accordingly, we find that the trial court erred in upholding the City's denial of Fleming's initial request.

We now consider Vasas's request. On September 25, Vasas delivered a signed, written request to the City seeking "[a]ll charges of Aggravated Felonious Sexual Assault" and "[a]ll charges of Drug/Alcohol Facilitated Sexual Assaults" from 2013 to 2017, as well as "[a] [c]opy of [Keene Police Department's] protocol for sexual assault incidents." On September 26, Dow acknowledged receipt of the request. On October 30, Vasas e-mailed Dow to inquire about the status of her request. Dow replied the same day, stating that "[t]he City . . . has determined that there are no existing governmental records listing all charges of aggravated felonious sexual assaults for the years 2013 through 2017 or charges of drug-alcohol facilitated sexual assaults from 2013 through 2017." Dow also informed her that the Keene Police Department's sexual assault protocol was being reviewed by the city attorney, and that it would be made available to her. The protocol was indeed made available later that week.

The trial court upheld the City's denial of the remainder of Vasas's request, finding that "[t]he rhetoric of criminal procedure make[s] Ms. Vasas' request impossible to respond to literally, as a 'charge' is not a record but rather an accusation . . . that may or may not result in a conviction." The trial court observed that "a 'charge' could pertain to an indictment or a complaint

5

filed by the state against a defendant," and thus found that "[i]t would be reasonable for the City . . . to find Ms. Vasas' request too vague to respond to at all." However, the trial court continued, "[r]ather than deny her request as vague, the City interpreted Ms. Vasas' request to be one for a list of charges of the two statutes, a reasonable interpretation because of the nature of a 'charge' and the lack of detail in Ms. Vasas' request." The trial court concluded that, because the petitioners "[have] not suggested any other form of records Ms. Vasas could have meant with her request[,] [t]he Court finds the City's interpretation was reasonable."

On appeal, the petitioners observe that the City did not deny Vasas's request on the basis that her request was too broad or too vague, but rather because the City did not maintain a list of all charges of the specified crimes. They contend that "[t]his is not a valid or reasonable basis for denial, as Vasas clearly never asked for anything like a list," and that "Vasas is entitled to each and every document, not otherwise exempt, that could reasonably be construed as a 'charge.'" We agree.

Vasas sought governmental records regarding "[a]ll charges" of certain crimes during a specified time period. Nowhere in her request did she seek a "list." Plainly read, Vasas's request was not for a list of charges, but was a request for the charges themselves. Although we recognize that Vasas's request could have been clearer, it still "reasonably described" the governmental records sought, as required by RSA 91-A:4, IV. Indeed, the trial court itself identified potentially responsive documents — indictments and complaints — which should have been provided in response to the request, provided that the City maintained such records. Moreover, the City admitted, as it had with regard to Fleming's request, that Vasas's request "could have been interpreted differently by the City upon initial review, and that governmental records responsive to [her] request[] are contained in the City's Police Department files, subject to appropriate redaction." Accordingly, we find that the trial court erred in upholding the City's denial of Vasas's request.

## II. Adequacy of Search for Requested Documents

The petitioners argue that the trial court erred by finding that the City did not violate RSA chapter 91-A in regard to the adequacy of its search for the records requested by Fleming and Vasas. In the trial court's August 2018 order, it stated that, "[h]aving found that the City properly construed both Mr. Fleming's and Ms. Vasas' requests as requests for lists, the Court only analyzes whether the City adequately searched for responsive records that already existed in the form of lists." Thus, because we have determined that the trial court erred in construing Fleming's and Vasas's requests as requests for lists, we vacate the trial court's decision with regard to the adequacy of the City's search, and remand for reconsideration.

6

Next, the petitioners argue that the trial court erred when, in response to Pecci's request for documents related to police use of excessive force, it allowed the City to redact officer names that were listed in a summary report, and did not order the City to produce the underlying citizen complaints which provided the basis for the report.

On September 24, 2017, Pecci e-mailed a request to the City, seeking "[a]ny and all documents from August 1, 2012-September 22, 2017 . . . regarding: any and all citizen complaints, logs, calls, and emails regarding charges of excessive police force and/or police brutality." Pecci also requested "a list of every officer who . . . was reprimanded for using excessive force and or brutality" during the same time period. On September 25, Dow acknowledged receipt of the request, informing Pecci that the City requires that requests be in writing and signed by the requester. Nonetheless, Dow stated that he would begin processing the request, and informed her that fulfilling the request may take up to 30 days. Thereafter, Pecci hand-delivered an unsigned, written request to the City.

On October 16, Pecci e-mailed Dow inquiring about the status of her request. He replied the following day, informing her that he was out of the office, but that he would follow up on her request. On October 31, Dow e-mailed Pecci advising her that he had not yet received a signed, written request from her. Dow also e-mailed the police chief and city manager to inform them of the request and ask them to search for responsive records. On November 2, Pecci submitted a signed, written request. On November 15, Pecci e-mailed the city manager regarding her request, but did not receive a response. The following day, Dow e-mailed Pecci, informing her that the City had located responsive documents, and that the City's legal department was reviewing them to determine whether they were subject to disclosure. On November 21, Dow e-mailed Pecci and informed her that documents were available for her review, but he noted that, pursuant to exemptions found in RSA 91-A:5, IV (2013), the City had redacted police officers' names, and withheld copies of formal complaints made through the police department's internal investigation process. Thus, the only record provided to Pecci was a report created by the former police chief, which contained statistical summaries of citizen complaints of excessive force during the requested time period. In the report, the City redacted certain columns and headings within the tables. On December 11, Pecci reviewed the documents.

In its August 2018 order, the trial court found that the City failed to carry its burden to show that the records it withheld and redacted were subject to the exemption for "internal personnel practices," as provided by RSA 91-A:5, IV. However, the trial court could not determine whether the documents were, in fact, exempt from disclosure without viewing them in their entirety. It

therefore ordered the City to submit within 30 days "the unredacted records Ms. Pecci requested for in-camera review with explanation of why the privacy interest supporting redactions outweigh the public's interest in access."

In its January 2019 order, the trial court observed that "[d]espite the Court's direct order to provide the unredacted Summary Reports Tables that Ms. Pecci requested, the City did not provide them, redacted or unredacted. The City has instead submitted 119 pages of citizen complaints . . . and stated that these documents are responsive to Ms. Pecci's request." The trial court found that, "even with two opportunities, the City has failed to explain why the redactions on the summary reports were proper and in compliance with RSA 91-A:5, IV." Nonetheless, the trial court found that it "cannot order disclosure of records that are exempt under the Right-to-Know law," and proceeded to analyze whether the redactions were proper based on the information available to it.

In its analysis, the trial court first considered the scope of the information sought by the petitioners. The trial court found that the petitioners had not requested the officers' names in their petition, and, moreover, that they had conceded that the officers' names were properly redacted. However, because the trial court determined that the column headings in the Summary Reports Tables would not fall within the "internal personnel practices" exemption, or the "personnel file" exemption under RSA 91-A:5, IV, it concluded that the City must "provide Ms. Pecci with the Summary Reports Tables with <u>no</u> redactions <u>other than</u> the officer names, which must be replaced with an anonymous signifier so as to permit the reader to observe repeated entries." Separately, with regard to the underlying citizen complaints, the trial court reasoned that, although they were responsive to Pecci's request, the petitioners had not requested the documents in their petition to the court, and, therefore, the documents were not at issue in the case. Regardless, the trial court noted, citing <u>Union Leader Corp. v. Fenniman</u>, 136 N.H. 624, 627 (1993), even if the citizen complaints were at issue, they would be exempt under RSA 91-A:5, IV.

On appeal, the petitioners argue that the trial court erred in failing to order that the unredacted report be released, because the City failed to meet its burden to show that its redactions were lawful. Further, the petitioners argue that the officers' names were clearly requested by both Pecci's request and the petition to the court, and that the petitioners did not concede that the redaction of the names was proper. Separately, the petitioners also argue that the citizen complaints were clearly sought by Pecci's request and by their petition. Additionally, they contend that the trial court's alternative reasoning — that, pursuant to <u>Fenniman</u>, the citizen complaints were exempt under RSA 91-A:5, IV — is also erroneous. Lastly, the petitioners argue that <u>Fenniman</u> should be overruled.

The City counters that governmental records related to, or arising from, an internal police department investigation of alleged police officer misconduct are categorically exempt from public disclosure under Fenniman. The City admits that the summary report was not submitted to the trial court "through inadvertence and mistake but not intentionally," but notes that it adhered to the trial court's order and released the summary report to Pecci with non-identifying letters in place of the redacted officers' names.

We agree with the petitioners that the trial court erred in finding that the petitioners, in their petition, failed to request the officers' names that the City had redacted in the summary report. Pecci's Right-to-Know request sought documents regarding "any and all citizen complaints, logs, calls, and emails regarding charges of excessive police force and/or police brutality," and "a list of every officer who worked for KPD and was reprimanded for using excessive force and or brutality." Because Pecci's request specifically sought the officers' names, the petitioners' petition — requesting that the court "fulfill these 5 Right-to-Know requests" — sought the officers' names as well.

Moreover, we agree with the petitioners that they did not concede that the City's redaction of the officers' names in the summary report was proper. In their memorandum of law, the petitioners argued that "[w]hile the specific names of the officers may be properly exempted, their identity would still be protected by replacing each name with an arbitrary but consistent identifier, such as Officer #1." (Emphasis added.) We do not read this statement as a concession, but rather as an alternative argument that, even if the officers' names were properly redacted, the use of arbitrary identifiers would protect the officers' identities while still enabling "officers with multiple complaints [to] stand out." Indeed, the petitioners took that position in their motion to reconsider the trial court's second order: "when [the petitioners] wrote 'the names of the officers may be properly exempted,' they did not inten[d] to concede this point, but to anticipate that as a possible position taken by [the City]. The [petitioners] were trying to argue in the alternative."

Separately, with regard to the citizen complaints underlying the summary report, we find that the complaints were unquestionably within the scope of Pecci's request, and, therefore, for the same reasons discussed above with regard to the officers' names, were also, by extension, within the scope of the petitioners' petition to the trial court.

Accordingly, having found that the petitioners indeed requested the officers' names, that they did not concede that the redaction of the names was proper, and that they also requested the underlying citizen complaints, we reverse the trial court's rulings to the contrary. However, because the remainder of the trial court's analysis regarding the redacted summary report and the underlying citizen complaints was inexorably intertwined with those contrary rulings, and because our recent decisions in Seacoast Newspapers,

Inc. v. City of Portsmouth, 173 N.H. ___ (decided May 29, 2020), and Union Leader Corporation & a. v. Town of Salem, 173 N.H. ___ (decided May 29, 2020), overruled Fenniman, thereby changing the nature of the exemption analysis, we vacate the remainder of the trial court's order on these issues, and remand for reconsideration in light of Seacoast Newspapers, Union Leader, and this decision. On remand, the City shall provide the trial court with the unredacted summary report for in camera review.

### IV. Charge for Access to Requested Records

The petitioners argue that the trial court erred when it upheld the City's proposed $300 charge for access to the records requested by King. King requested "[a]ny and all email correspondence[]" between the City and local restaurants regarding food safety inspections during 2016 and 2017. The City responded that it had conducted between 800 and 1,000 inspections during the time period, and that, because the City "would need to retrieve and print these emails[,] . . . the cost to provide this information would be approximately $300." The City urges us to adopt the reasoning of the trial court, which found that

> the City [could not have] provided these emailed reports without either providing Ms. King with computer access to the email account or accounts that sent the reports[,] or printing the emails. There is no reasonable argument that the City should provide Ms. King with access to a City employee's account or access to a City computer to view these emails. Therefore, Ms. King's only option of receiving these emailed reports was for them to be printed out.

We agree with the petitioners that the trial court erred. The Right-to-Know Law provides that "[n]o fee shall be charged for the inspection or delivery, without copying, of governmental records, whether in paper, electronic, or other form." RSA 91-A:4, IV (amended 2019). King did not request copies of the e-mails; rather, she requested that the e-mails be made available to her for inspection. The City is obligated to provide access to non-exempt governmental records free of charge. Id. Furthermore, the City is required to maintain its records "in a manner that makes them available to the public." Hawkins v. N.H. Dep't of Health & Human Services, 147 N.H. 376, 379 (2001). Thus, even if we were to accept the questionable proposition that printing the e-mails is the only acceptable means of making them available to King for inspection — a proposition that does not appear to reflect the realities of the digital age — King is not obligated to pay the City merely to inspect these records. See RSA 91-A:4, IV.

The City also argues that, because "the governmental records requested by Ms. King are numerous, and exist in various email accounts and potentially across several City agencies," providing access to the responsive records would

— in contravention of the Right-to-Know Law — require the City to "compile, cross-reference, or assemble information into a form in which it is not already kept." RSA 91-A:4, VII; see also Brent, 132 N.H. at 426 ("[T]he statute does not require public officials to retrieve and compile into a list random information gathered from numerous documents, if a list of this information does not already exist."). We disagree. "Right–to–Know requests often require a public official to retrieve multiple documents. . . . While the Brent rule shields agencies from having to create a new document in response to a Right-to-Know request, it does not shelter them from having to assemble existing documents in their original form." N.H. Civil Liberties Union, 149 N.H. at 439-40.

## V. Signed, Written Requests

Next, the petitioners argue that the trial court erred when it found that they lacked standing to challenge the City's requirement that requesters submit signed, written requests. The trial court found that the petitioners "failed to allege that any of the students were prohibited from receiving responsive records because of the City's practice or that their rights to access were otherwise affected by the practice." Therefore, the trial court declined to consider whether the City's "signed, written request" requirement was a violation of RSA chapter 91-A because "no particularized harm ha[d] been alleged," and the court "[did] not have a sufficient allegation before it to adjudicate the issue." The petitioners contend that it was improper for the trial court to ignore "technical" or "harmless" violations that did not result in prejudice to the requester. See ATV Watch v. N.H. Dept. of Resources & Econ. Dev., 155 N.H. 434, 440-41 (2007). The City counters that the trial court did not err because the City never relied on the policy when denying the requests for records, and none of the petitioners allege that they were prejudiced or harmed by the policy. We agree with the City.

"Whether a person's interest in the challenged administrative action is sufficient to confer standing is a factual determination to be undertaken on a case by case basis." Censabella v. Hillsborough Cnty. Attorney, 171 N.H. 424, 427 (2018) (quotation omitted). To have standing under RSA 91-A:7, the parties must have "personal legal or equitable rights that are adverse to one another, with regard to an actual, not hypothetical, dispute, which is capable of judicial redress," and "a party must demonstrate harm to maintain a legal challenge." Id.

Here, none of the petitioners' requests were denied on the ground that they failed to provide a signed, written Right-to-Know request. Although the City's response to Pecci's request was delayed as a result of her failure to adhere to the City's policy, she did receive responsive documents, and there is no allegation that she was harmed by the delay.

11

Although we have held that "[t]he plain language of [RSA 91-A:4, IV] does not allow for consideration of the factors . . . such as 'reasonable speed,' 'oversight,' 'fault,' 'harm,' or 'prejudice,'" ATV Watch, 155 N.H. at 440-41, that case dealt with a clear violation of the five-day response deadline set forth in RSA 91-A:4, IV. See id. Here, the City satisfied that requirement when it provided an initial response to each request — whether written, or signed, or unsigned — within the five-day period. We need not address the issue of whether a delay in responding to a request could pose harm and, in and of itself, give rise to standing, because the petitioners have not alleged that they, in fact, suffered any harm. Thus, we conclude, as did the trial court, that the petitioners lack standing to challenge the City's policy.

Nonetheless, we observe that the City's practice of requiring signed, written Right-to-Know requests may be susceptible to challenge. As we observed in Censabella, "it would not be unreasonable for a requester to desire anonymity in the early stages when making a Right-to-Know Law request. Such requests may implicate political, policy, or public interest considerations, particularly when the request is pursued by a whistleblower or advocacy organization." Censabella, 171 N.H. at 428. For these reasons, the City may wish to revisit its policy.

## VI. Response Times

Lastly, the petitioners argue that the trial court erred when it found that the City's response times to their Right-to-Know requests were "reasonably necessary." Specifically, the petitioners contend that "Pecci was told by Dow that she would have a response by October 25th, thirty (30) days from receipt of her request. She received her response on November 21st, after she appealed to the City Manager on November 15th." The petitioners argue that this delay was unreasonable because it was caused by the City's policy of requiring signed, written Right-to-Know requests. The City counters that we should adopt the trial court's reasoning. The trial court found that

> [t]he plain language of the statute requires the responding public body or agency to send receipt to a request with a statement of the time reasonably necessary to determine whether the request shall be granted or denied. It is required that an estimate be given; what that estimate is, however, is explicitly left to the responding public body or agency to determine what is reasonable.

(Citations and quotations omitted.) We agree with the City.

 "[P]ublic bodies have a statutory duty to respond diligently to all records requests, regardless of who makes the request." Censabella, 171 N.H. at 427-28 (quotation omitted).

12

The time period for responding to a Right–to–Know request is absolute. The statute mandates that an agency make public records available when they are immediately available for release, or otherwise, it must within five business days of the Right–to–Know request: (1) make the records available; (2) deny the request in writing with reasons; or (3) acknowledge receipt of the request in writing with a statement of the time reasonably necessary to determine whether the request will be granted or denied.

ATV Watch, 155 N.H. at 440-41 (emphasis omitted); see also RSA 91-A:4, IV.

As noted above, the City responded to each student's request within five business days. However, we have not previously considered the outer limits of what constitutes a "reasonably necessary" response time for providing documents that are not immediately available. RSA 91-A:4, IV. Such a determination must be made on a case-by-case basis. Here, the circumstances are unusual if not unique: within a short period of time, the City received numerous and expansive requests from Salcetti's students raising complicated issues under the Right-to-Know Law, and requiring careful analysis by the City. Only some of those requests are the subject of this litigation. Pecci's request, in particular, required careful analysis by the city attorney in a notably complex and sensitive area of the Right-to-Know Law. Accordingly, under the circumstances, we conclude that the City's response time was not unreasonably long. See ATV Watch, 161 N.H. at 756 (finding that an initial response within five business days, coupled with an estimated response time of 50 days for the requested documents, complied with the Right-to-Know Law "[o]n its face").

In conclusion, we observe that this dispute has consumed an inordinate amount of time, energy, and resources — judicial and otherwise. The salutary purpose of the Right-to-Know Law — to "ensure both the greatest possible public access to the actions, discussions and records of all public bodies, and their accountability to the people," RSA 91-A:1 — is best served when the members of the public and the governmental bodies are guided by a spirit of collaboration. We take this opportunity to encourage all public bodies, and members of the public making Right-to-Know requests, to embrace that spirit, and work together to efficiently and effectively resolve disputes involving RSA chapter 91-A. This case, on remand, presents just such an opportunity.

Affirmed in part; reversed in part; vacated in part; and remanded.

HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.